IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CIVIL ACTION NO.: 3:19-CV-00088-GCM

| | | |
|---|---|---|
| DONALD DANIELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **SECOND-AMENDED COMPLAINT** |
| | ) | **JURY TRIAL DEMANDED** |
| HYSTER-YALE GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| | ) | |

NOW COMES Plaintiff Donald Daniels, by and through undersigned counsel,

complaining against Defendant Hyster-Yale Group, Inc. and alleging as follows:

## INTRODUCTION

1.     This is an action to redress retaliation by Defendant Hyster-Yale Group, Inc.

("HYG") against Plaintiff Donald Daniels, after he engaged in whistleblower activity protected

under Title VIII of the Sarbanes-Oxley Act of 2002 (the "Act" or "Sarbanes Oxley").

2.     HYG is a wholly owned subsidiary of Hyster-Yale Materials Handling, Inc., a

publicly traded company that designs, engineers, manufactures, sells and services a

comprehensive line of forklift trucks.

3.     HYG has a wide global presence, among the largest of all material handling

manufacturing companies.

4.     Daniels worked for HYG as the national accounts manager for Amazon, one of

HYG's most lucrative and promising customer accounts.

5.      In late 2017, Daniels reported fraudulent conduct of an HYG executive involving critical aspects of HYG's business relationship with Amazon and other corporate partners.

6.      No later than January 29, 2018, HYG formally demoted Daniels to a position specially created for him, "customer experience manager," in retaliation for his protected whistleblowing activity.

7.      Plaintiff brings this action seeking *inter alia* full back pay with interest, special damages, and his reasonable attorney's fees, litigation costs, and expert witness fees.

## JURISDICTION

8.      On July 18, 2018, Daniels timely filed a complaint with the Secretary of Labor of the U.S. Department of Labor, numbered 4-3750-18-128, alleging that HYG violated Title VIII of Sarbanes Oxley, by retaliating against him for engaging in protected activity under the Act.

9.      The Secretary did not issue a final decision within 180 days of the filing of the complaint, and any delay by the Secretary is not due to any bad faith of Daniels.

10.     All conditions precedent to the filing of this action have been met.

11.     Jurisdiction is conferred on this Court by 18 U.S.C. § 1514A(b) and 28 U.S.C. § 1331.

## PARTIES

12.     Plaintiff is an adult resident of Pitt County, North Carolina.

13.     Defendant HYG is a corporation formed under the laws of Delaware with a principal office in North Carolina and/or Ohio. HYG's "Americas Headquarters" are located at 1400 Sullivan Dr., Greenville, North Carolina 27834. HYG can be served at the office of its registered agent, Corporation Service Company, 2626 Glenwood Ave., Raleigh, North Carolina 27608, or where ever found.

14.     Hyster-Yale Materials Handling, Inc. is a publicly traded company with a class of securities registered under section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l. Hyster-Yale Materials Handling, Inc. is required to file reports under section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d). HYG's financial information is included in the consolidated financial statements of Hyster-Yale Materials Handling, Inc.

15.     At all relevant times, Plaintiff was HYG's "employee," as that term is used in 18 U.S.C. § 1514A(a), at HYG's facility located at 5200 Martin Luther King Jr. Hwy. in Greenville, North Carolina.

## FACTS

16.     HYG hired Daniels on around February 1, 2013.

17.     Daniels is an engineer by training, and he began his career at HYG as a technical specialist. Daniels's first job title for HYG was manufacturing engineer.

18.     Within a short time, HYG promoted Daniels to a managerial position supervising engineers and technicians, then again to lead warehouse simulations engineer for North and South America.

19.     Amazon was the "number one priority" of HYG, according to Chuck Pascarelli, president of the HYG's Americas Division. The Amazon account had the potential to produce more than $50 million in annual sales to HYG.

20.     In 2016, Amazon issued requests for proposals (RFPs) to address its warehouse truck needs. Amazon sent RFPs to multiple vendors, including HYG.

21.     Chuck Tolley was HYG's national account manager for the 2016 Amazon bid process.

22.     Amazon communicated to HYG that it preferred that a technical specialist on HYG's sales team be the primary point of contact, to explain the vendor's proposal. Daniels was therefore recruited to the team pitching HYG's proposal to Amazon.

23.     During the 2016 pitch process, Daniels's formal job title was lead warehouse simulation engineer, but he worked primarily in sales on the Amazon account.

24.     Daniels directly participated in the sales teams' efforts to persuade Amazon to award site-supply contracts to HYG. Daniels met directly with Amazon's representatives and was the primary communicator regarding the capabilities and technical aspects of HYG products.

25.     Amazon awarded a number of warehouse sites to HYG, and pursuant to contracts, HYG then supplied forklift trucks, equipment, and services to those sites.

26.     In the fall of 2016, HYG promoted Tolley to "executive business manager," a position in which he oversaw both the Amazon and Target accounts.

27.     HYG created the position of executive business manager specifically for Tolley, to generate national business from large companies like Amazon.

28.     At the same time, HYG formally posted a job opening for the national accounts manager (NAM) position vacated by Tolley, who recommended that Daniels apply for the position.

29.     Daniels did apply, and HYG formally offered Daniels the position of national accounts manager, in writing. The offer letter signed by Mr. Daniels begins, "Congratulations! I'm pleased to offer you the role of National Account Manager with Retail and Global Accounts."

30.     HYG held out Daniels to Amazon as "national accounts manager," including through the signature line in his HYG email account. On occasion, HYG referred to Daniels's job title as the "point of delivery" NAM for Amazon.

31.     As NAM for the Amazon account, Daniels was paid a base salary and earned commissions based on performance, among other employment benefits.

32.     Daniels supported the manufacturing, delivery, install, and commissioning of Amazon's 2016 award of contracts to HYG.

33.     Daniels also led automation, alternative energy, and safety projects, as well as HYG's bids for the 2017 Amazon business account.

34.     During the relevant period, Daniels reported to Tolley, who in turn reported to George Towne, director of national account sales.

35.     Kelly Smith, vice president of North American sales, and David Furman, president of sales and marketing, served above Towne.

36.     Pascarelli, president of HYG's Americas Division, oversaw HYG's sales and marketing division for the entire country.

37.     Smith and Tolley were close friends, and she orchestrated the decision to specially create the position of "executive business manager" for Tolley.

### H2O Battery Pro, LLC and Battery Malfunctions

38.     Three of the Amazon sites for which HYG was awarded a contract were in the Chicago area, designated MDW2, MDW4, and MDW6. (Amazon names all its sites after the most nearby airport; here, Chicago Midway International Airport.)

39.     HYG supplied battery-powered electric trucks to these and other sites.

40.     The batteries were Deka-brand (supplied by East Penn Manufacturing), with chargers supplied by Ametek.

41.     These batteries required watering. The water levels had to be regularly monitored and maintained.

42.     East Penn provided a warranty for the batteries, which had an expected useful life of seven to 10 years, depending upon application.

43.     The warranties were conditioned on the proper maintenance of the water needs of the batteries. The contract between HYG and Amazon required HYG to provide for that maintenance, either directly or through subcontractors.

44.     Tolley oversaw identifying and subcontracting with a company to provide the maintenance for the batteries for these two sites.

45.     Tolley arranged to subcontract this work to H2O Battery Pro, LLC ("H2O Pro").

46.     H2O Pro sent invoices and weekly "watering reports," and other interstate email communications, including those sent and received from the Amazon sites in Illinois to HYG's headquarters in North Carolina.

47.      A "Tina Erickson" received and responded to emails, on behalf of H2O Pro, with Amazon, HYG, and others.

48.     The weekly watering reports included information regarding the condition of the battery chargers and the settings on the Battery Discharge Indicator (BDI) on HYG's trucks, as maintained by H2O Pro.

49.     Daniels and Tolley communicated with Amazon and H2O Pro, as representatives of HYG.

50.     From approximately November 2016 to September 2017, Amazon complained repeatedly about the performance of the batteries in HYG's forklifts.

51.     Specifically, Amazon reported that the batteries would appear as though they were fully charged when the batteries were docked in the charging unit, but—when removed and placed in the truck—the batteries would show a charge of 60% or less.

52.     Given the schedules of the forklift operators and the charge time for the batteries, it was essential for Amazon's operations that the batteries be fully charged at the beginning of each shift.

53.     Batteries with incomplete charges at the beginning of a work shift caused operational inefficiencies and lost operator time on the trucks.

54.     The persistent battery malfunctions created operational loss for Amazon.

55.     In August 2017, "Tina Erickson" sent an email on behalf of H2O Pro to HYG, attempting to blame the battery malfunctions on user error on the part of Amazon's operators.

56.     An HYG fleet management representative relayed this explanation to Amazon, East Penn, and Ametek.

57.     Over the following week, emails were exchanged within the HYG team servicing the Amazon account, including Daniels and Tolley, as well as externally with representatives of Amazon, East Penn, and Ametek.

58.     During these discussions, numerous engineers and product specialists, including Daniels, hypothesized that the charging problems were, in fact, the result of improper watering by H2O Pro.

59.     Additionally, East Penn reported the need for deionization of the water, in which case Amazon or HYG might be required to purchase deionization equipment.

60.     On behalf of HYG, Tolley disagreed with these assessments and insisted the battery issues could <u>not</u> be a watering problem, that H2OPro was performing well, and that the problem was either a technical flaw in the chargers or else operator error.

61.     In fact, improper and inconsistent watering was the cause of the problems.

62.     Improper and inconsistent watering of batteries can pose serious occupational safety hazards. The improper watering of batteries is a serious safety issue that can result in loss to human life or limb.

63.     Batteries need to be watered on a regular basis. Not only is watering on a regular basis important, but the time of day is also important.

64.     Daniels knew at this time about the dangers of improper battery maintenance from his technical background as an engineer.

65.     Lead acid batteries used in HYG forklifts give off highly explosive hydrogen gas while the water evaporates. The danger is that the hydrogen gas can explode if a spark occurs nearby.

66.     Numerous sources of voltage strikes can result in a battery explosion. For an improperly watered battery, the battery itself can be an ignition source to the hydrogen gas, including in the event the battery plates touch and cause a voltage strike and/or spark.

67.     Separate and apart from the battery, a forklift truck contains hundreds of other potential ignition sources (e.g., contacts for motors, lights, switches, and other attachments), each of which have the capability of producing a deadly spark in an improperly watered battery.

68.     In 2017, Amazon forklift operators, including those working at MDW6, complained of experiencing voltage shocks, conditions that could have resulted in a deadly explosion to an improperly watered battery.

69.    In response, Amazon conducted complete site-cable inspections on multiple occasions, but was unable to identify the source of the problems.

## Daniels Discovers HYG's "Battery Fraud"

70.    On August 24, 2017, Teresa Jorden, an administrative assistant to Adam Carraway, head of fleet services, asked Daniels quizzically, "Who's *Weston* Tolley?"

71.    Jorden noticed the name "Weston Tolley" on an email from H2O Pro, which had been forwarded with one of the watering reports for the Amazon account.

72.    Daniels and Jorden then had a conversation in which Jorden hypothesized that "Weston" was Chuck Tolley's middle name, while both parties wondered aloud about the connection between Weston Tolley and H2O Pro.

73.    From this conversation, Daniels began an investigation that revealed the hidden ownership of H2O Pro—and fraud that was perpetrated by Tolley, on behalf of H2O Pro and HYG.

74.    Daniels went online to check business filings for H2O Pro and discovered that Chuck Tolley was the LLC's managing member. Tolley formed H2O Pro in Indiana on October 10, 2016.

75.    Subsequent investigation by Daniels revealed that H2O Pro had only one employee: Weston Tolley, that is Chuck Tolley's son.

76.    Weston Tolley lacked any experience or expertise in maintaining batteries of the sort used by the HYG trucks supplied to Amazon. Upon information and belief, Weston Tolley's most recent job history included working as a clerk at an alcoholic beverage control store, also known as an "ABC store."

77. Daniels further discovered that Tolley's wife, Tina Erickson Tolley (hereinafter, "Ms. Tolley"), was also a member of H2O Pro.

78. Upon information and belief, Ms. Tolley has spent her career in the restaurant industry.

79. Tolley actively concealed his ownership and control of H2O Pro by using the pseudonym "Tina Erickson" in written communication on behalf of H2O Pro.

80. Upon information and belief, Tolley and not his wife signed emails "Tina Erickson."

81. Ms. Tolley lacked any experience in battery maintenance and, therefore, could not have independently drafted and/or sent the emails in question.

82. Tolley never disclosed to HYG, Amazon, or any other party that he had—in a brazen act of self-dealing—awarded a maintenance contract to a company he owned and controlled.

83. While acting in dual roles on behalf of H2O Pro ("Tina Erickson") and HYG (as executive business manager), Tolley misrepresented material facts to Daniels, Amazon, Ametek, East Penn, and others, including in interstate communications.

84. These material misrepresentations related to both the battery watering services delivered by HYG through its subcontractor to Amazon, and the source of significant, widespread, and dangerous battery problems suffered by Amazon at three of their facilities in the Chicago area, and potentially other sites in Indianapolis and elsewhere (hereinafter, the "Battery Fraud").

85. The parties to the Battery Fraud relied on these misrepresentations in failing to take appropriate corrective actions for months.

86.     H2O Pro did not, in fact, deliver the battery watering, as represented, to at least three of Amazon's sites in the Chicago area—known as MDW2, MDW4, and MDW6—from approximately November 2016 to September 2017.

87.     During the period in question, Weston Tolley purportedly drove from Indianapolis—where he worked the night shift as an ABC store sales clerk—to Chicago and back to perform the battery watering services (approximately 365 miles round trip).

88.     Upon information and belief, Tolley further attempted to fraudulently secure business for H2O Pro at Amazon's "IND4" facility in Indianapolis, Indiana. The IDN4 facility is located mere blocks from Weston Tolley's apartment.

89.     More specifically, in January 2017, Tolley acted on behalf of HYG to ask Ametek and East Penn to do a battery study at IND4 using four HYG forklifts and four Raymond-brand forklifts.

90.     Upon information and belief, this "battery study" was a guise for his true intent, to secure additional business for H2O Pro.

91.     Upon information and belief, Tolley manipulated BDI settings on HYG forklifts and Raymond-brand forklifts, both in the Chicago facilities to further conceal the Battery Fraud, and at IND4 to ensure false readings during the battery testing by Ametek and East Penn.

92.     Upon information and belief, Tolley's plan was to use the false BDI readings at IND4 to support the purported need to outsource battery maintenance at the IND4 facility to H2O Pro.

93.     Daniels and HYG engineers that he oversaw noticed altered BDI settings on forklifts during this time, and they were unable to explain the altered settings by reference to any benign explanation.

94.     During this time, Amazon operated these facilities at an increased risk of battery explosion on its HYG forklifts.

95.     A cursory examination of the invoices and watering reports reveals that H2O did not deliver the services in question.

96.     For example, at MDW6, "order pickers" (also known as "order selectors") were by far the most prevalent HYG vehicle on site, with approximately 145 total order pickers at MDW6. However, the invoices do not show any watering of order pickers at MDW6.

97.     The documents further show that H2O claims to have performed 586 total waterings at MDW6 in January 2017, of which 405 were on center riders. In fact, there were only nine total center rider vehicles at MDW6 during this time.

98.     Daniels recognized that Tolley had engaged in fraud and had been acting in his own financial interest, while depriving HYG of his honest services.

99.     At the same time, HYG, through Tolley, had directly misled Amazon, East Penn, and Ametek regarding responsibility for the watering and the resulting problems with the batteries.

100.    Tolley ratified the Battery Fraud on behalf of HYG when he responded to the "Tina Erickson" emails from his HYG email account, denying that H2O's watering services, or lack thereof, could be responsible for the widespread battery malfunctions observed at the Amazon sites.

101.    The Battery Fraud resulted not only in known harm, in the form of lost productivity to HYG and Amazon, but also in the risk of millions of dollars in lost contracts with Amazon—and the increased risk of loss to human life and limb.

102.    HYG, through its executive business manager, perpetrated fraud against three of its most important business partners: Amazon, Ametek, and Deka.

103.    The Battery Fraud risked causing significant reputational harm to HYG and corresponding damage to HYG's valuable contractual relationships with these companies.

104.    In 2018, Amazon's national bid package for forklifts was approximately $128 million.

105.    HYG's internal goal was to become Amazon's second-ranked forklift supplier, satisfying at least 40% of Amazon's bid package (the equivalent of $51.2 million in 2018).

106.    HYG's loss of business in the Amazon account would negatively impact HYG shareholder value.

107.    Amazon has demonstrated a practice of holding HYG accountable for mistakes in judgment and failures to deliver on promises. After first earning a contract with Amazon in 2016, HYG was denied any sales to Amazon in the 2017 bid process because Amazon held HYG accountable for its failure to deliver next-generation hydrogen fuel-cell forklift trucks on the timeline promised by Tolley.

108.    Amazon could be expected to penalize HYG or otherwise discount HYG's bids if made aware of the Battery Fraud, with the potential for losses of revenue in the tens of millions of dollars.

109.    The improper watering of the batteries further could have reduced the lifetime of the batteries and voided the warranty by the manufacturer, East Penn.

110.    The life expectancy of an industrial battery is measured using charging cycles. A well-maintained battery would last around 2,000 charge cycles, whereas the expected lifetime of

a poorly maintained battery could be reduced to half or less of the expected charging cycles (i.e., 1,000 or fewer).

111.     East Penn positioned itself to void the warranty on its batteries at the relevant Amazon sites, due to the lack of proper deionized watering.

112.     The value of an industrial battery ranges from $5,000 to $8,000. The replacement cost of the batteries at just one of the Amazon sites, MDW6, exceeds $1 million.

113.     Due to the Battery Fraud, HYG risks further liability for battery replacement costs.

## Daniels Reports Battery Fraud to HYG Executives

114.     On around August 28, 2017, Daniels reported his findings on the Battery Fraud directly to David Furman, HYG's president of sales for the Americas.

115.     Daniels expressed concerns about workplace safety violations that had occurred and the harm that may result from the improperly maintained batteries.

116.     Daniels also expressed concerns about the potential effect of the Battery Fraud on HYG's business relationships with Amazon, East Penn, and Ametek.

117.     Furman responded that it was important to "keep Amazon happy, whatever it took."

118.     As a direct result of Daniels's whistleblowing activity, Tolley was separated from HYG on or about September 6, 2017, and HYG transitioned watering at the Amazon facilities from H2O Pro to a qualified local HYG dealer, Alta Equipment.

119.     HYG agreed with Daniels that Tolley had engaged in fraudulent conduct, as reflected in the termination of Tolley's employment upon Daniels's report of the same.

120.     Daniels communicated to Furman his opinion that HYG had a duty to disclose the Battery Fraud to HYG's shareholders.

121.     Daniels expressed further to Furman his belief that HYG had an obligation to notify Amazon, East Penn, and Amatek about the source and cause of the battery malfunctions.

122.     HYG denied any obligation to make these disclosures and, upon information and belief, never reported the Battery Fraud to any of Amazon, East Penn, Amatek, or the company's shareholders.

123.     HYG instead concealed the Battery Fraud from its business partners and shareholders, to whom the cost of the fraud had been passed.

124.     In around September 2017, shortly after Daniels's report of the Battery Fraud, a battery exploded on an HYG forklift at one of Amazon's facilities in Charlotte, North Carolina (the so-called "CLT2" site).

125.     HYG was responsible for the maintenance of this battery.

126.     An investigation into the explosion found that low water levels resulted in plate-to-plate contact and the ignition that caused the explosion.

127.     The battery that exploded at CLT2 was a 12-volt DC battery—that is, the forklift used four 12-volt DC batteries, as commonly found in a car.

128.     An explosion to a 24- or 48-volt industrial DC battery would be substantially more destructive. The HYG forklifts in operation at the Chicago Amazon facilities housed 24- and 48-volt industrial DC batteries.

### HYG Retaliates by Demoting Daniels to an Administrative Position

129.     Up through his final day of employment with HYG, Daniels was instrumental in promoting HYG's business relationship with Amazon.

130.    From October 2017 to January 29, 2018, Daniels's formal job title remained unchanged.

131.    Amazon preferred to work and interact directly with Daniels, even when HYG made available high-level executives for in-person meetings.

132.    Daniels was part of an HYG contingent that traveled to Seattle from September 13-15, 2017 to meet with Amazon, in advance of the 2018 bid. The HYG group included high-level executives, Furman, Smith and Towne, as well as others.

133.    Daniels was HYG's primary point of contact in these meetings, demonstrating an expertise and command of the issues facing Amazon and details of the 2018 bid for Amazon.

134.    The next month, on October 11, 2017, Daniels returned to Seattle to meet with Amazon executives again, this time with Towne and representatives from Electrovaya, a company that helped supply HYG's new line of lithium ion products.

135.    At one juncture during the Seattle meetings, on October 12, 2017, Vijay Muniyandi, Amazon's category manager of strategic sourcing, asked to meet with Daniels alone. Towne asked for and was given Muniyandi's permission to remain present.

136.    Muniyandi engaged in detailed conversations with Daniels about Amazon's requirements for the 2018 bid, including that HYG would have to commit to power a complete site fleet with only lithium ion technology to be awarded a bid.

137.    Muniyandi had a positive working relationship with Daniels and trusted him for honest representation of HYG and its products.

138.    After Tolley's termination, Daniels aptly managed HYG's participation in a large-scale pod transfer program, in which Amazon transferred "pods" (metal racks the size of refrigerators) from one Amazon facility to another, to increase efficiency.

139.    The project required the technical use of HYG elevators to remove and transfer the pods from various mezzanines and tiered levels within the Amazon facilities.

140.    Daniels participated in 30 to 40 phone calls per day on the project, including on weekends, through the last day he worked for HYG.

141.    The project was so important to Amazon that its CEO, Jeff Bezos, participated in internal Amazon calls for status updates.

142.    At the end of the pod transfer project, Muniyandi reported that Amazon had nothing but good things to say about the POD transfer project and HYG's management of the project, as performed by Daniels.

143.    HYG's strong performance on the pod transfer project set the company up well for the 2018 bidding process, which went through Muniyandi.

144.    Daniels also worked during this time on important automation testing projects at Amazon's "BFI1" site near Seattle, Washington. This work related to safety and operational testing on cutting-edge fully automated and robotic forklift units, in a partnership with Balyo.

145.    Notwithstanding Daniels's continued success with Amazon on behalf of HYG, Smith was committed to finding any way possible to promote someone else—anyone other than Daniels—to the NAM position for Amazon.

146.    Soon after Tolley's dismissal, on around September 6, 2017, HYG posted an opening for a position as the NAM for Amazon.

147.    For all intents and purposes, Daniels had worked for around one year as the Amazon NAM as of September 2017.

148.    Smith, vice president of North American sales, and Towne, director of national account sales, were HYG's key decisionmakers, regarding the terms and conditions of Daniels's employment with HYG.

149.    As of September 2017, Smith and Towne were two of at least eleven (11) HYG employees who knew that Daniels engaged in protected activity and was the source of the whistleblower complaint on the Battery Fraud.

150.    Smith had a close personal relationship with Tolley, and she went so far as to create a special position just for him, in which Tolley received commissions from not one, but two of HYG's most lucrative national accounts, Target and Amazon.

151.    Smith was unhappy with Daniels's whistleblowing activity, including the fact that his complaint had resulted in Tolley's dismissal.

152.    On around September 8, 2017, Smith took initial steps to give the Amazon NAM position to Michael Moran.

153.    Daniels learned of this plan and called Furman, who confided in Daniels that he was strongly opposed to the selection of Moran for the Amazon NAM position. Furman advised Daniels to voice his concerns about Moran's selection directly with Towne and Smith.

154.    On September 11, 2017, Daniels did so in a meeting with Towne and Smith, in which he expressed his continued interest in the Amazon NAM position.

155.    Smith responded that she appreciated Daniels was respected by the Amazon team and brought all the requisite technical knowledge and skill—and, therefore, HYG "couldn't afford to lose him and the relationships he had with Amazon."

156.    At the same time, Smith told Daniels that he lacked the minimum required sales experience to manage the account.

157. Smith denied Daniels's candidacy for the Amazon NAM position.

158. The purported lack of sales experience was a pretextual reason for the denial of Daniels's application.

159. In fact, HYG denied Daniels the position in retaliation for his protected activity, and without ever weighing in any meaningful way his credentials against other applicants.

160. Smith refused to consider Daniels for the position because he engaged in protected whistleblower activity, which resulted in the termination of her close friend, Tolley.

161. On around October 5, 2017, Smith picked David McNeill, an engineer with no sales experience, for the Amazon NAM position.

162. McNeill was less qualified than Mr. Daniels for the Amazon NAM position and failed to meet the formal qualification requirements of the NAM position.

163. HYG purported to require seven (7) years of sales experience for the NAM position. McNeill had no direct sales experience prior to his hiring as Amazon NAM.

164. Prior to his appointment to NAM of the Amazon account, McNeill had never earned a commission on a sale from HYG or, upon information and belief, any employer.

165. Upon information and belief, McNeil was passed over three times for prior NAM openings, due to his lack of sales experience.

166. Daniels had more relevant sales experience than McNeill, including the experience Daniels gained in over a year of direct sales experience with Amazon. Daniels had other relevant experience in sales prior to his work as the POD NAM for the Amazon account.

167. Smith directly contradicted her statements to Daniels regarding the need for sales experience, when communicating with McNeill to offer him the position.

168. Smith showed no interest in McNeill's relevant sales experience, or lack thereof.

169.     According to McNeill, Smith was not even concerned with sales experience in hiring for the Amazon NAM position. Later when asked if Smith hired him because of his sales experience, McNeill responded, "No, I think she was looking for somebody who had warehouse experience, warehouse products experience. . . . the ins and out of the trucks, and what they do, and how they can be used in the application, and how they're spec'd – and you know, I think that's what she was looking for . . . technical background, for this particular account."

170.     McNeill acknowledged to Smith that he "didn't have any sales experience," but Smith told him, "Point blank – she said, 'you have a significant amount of warehouse product experience, and I think that's what we need for this account.'"

171.     Daniels had significant technical expertise and warehouse products experience, as he was involved in important projects involving the development of fuel cells, safety features, and automation, as well as in warehouse simulation.

172.     HYG was focused on the automation portion of Amazon's business. Daniels had more technical knowledge regarding design and automation than McNeill.

173.     HYG later claimed that Daniels was not even considered for the Amazon NAM position because he never formally applied for the position, another pretextual and false explanation.

174.     In fact, Daniels was one of the applicants considered and rejected for the Amazon NAM position.

175.     HYG considered applications for the Amazon NAM position in September and October 2016. Daniels submitted no fewer than five written applications for NAM position between December 16, 2015 and October 11, 2016. Upon information and belief, an application

on file as submitted by Daniels on around June 15, 2016 was formally considered and rejected by HYG for the Amazon NAM position.

176.    McNeill's successful application was submitted on around July 29, 2016, that is before an opening for the Amazon NAM position was announced on around September 6, 2017.

177.    In late 2017 and early 2018, Daniels expressed to Towne his desire to be reassigned laterally to another national customer account as a NAM.

178.    Towne responded with his view that Daniels was qualified and well-suited for such a position. The two specifically discussed a potential opportunity for Daniels to be transferred to a POD NAM position for the Lowe's account.

179.    Prior to any retaliatory action taken against Daniels, both Smith and Towne knew that Daniels had engaged in protected whistleblower activity with regards to the Battery Fraud.

180.    Upon information and belief, Towne learned that Daniels was the source of the Battery Fraud, including through Jorden in September 2017.

181.    On September 21, 2017, Towne led a meeting in a conference room at HYG's headquarter building in Greenville, North Carolina.

182.    The other attendees included Jorden; Carraway, head of fleet services; and Ronda Burgess, national account strategic program manager.

183.    As Daniels was entering the conference room, he heard Jorden say, "I just don't want to be responsible for what happened to [Tolley]."

184.    Jorden was visibly upset in that moment. She was personally close to Tolley.

185.    Towne quickly interjected and asked Daniels to step out of the conference room: "Don, give us a second."

186.     Jorden's statement referred fto the fact that she had discovered Weston Tolley's name in the email and shared that information with Daniels, ultimately resulting in Tolley's termination.

187.     Daniels was made to feel uncomfortable by this interaction, and he did not return to the meeting in the conference room. He instead walked directly to the office of Christie Leitch, human resources manager, where he expressed concern that his whistleblowing activity was being discussed openly by his coworkers and supervisor.

188.     Leitch pledged that she would raise the issue with Michael Gregory, the vice president of human resources.

189.     There was no follow up from either Gregory or Leitch.

190.     Daniels later discussed concerns about the leaking of his role in the whistleblower complaint with Furman, who reassured Daniels that HYG was taking steps to keep confidential his role as the Battery Fraud informant.

191.     On January 17, 2018 Daniels filed a report through the HYG "hotline." Daniels expressed his concern that he suspected HYG was preparing to demote him, or otherwise was seeking to demote him.

192.     On January 29, 2018, HYG formally demoted Mr. Daniels from an executive-level position as a national account manager to a non-sales, administrative position as "customer experience manager."

193.     Daniels first learned of his new job title and responsibilities on January 29, 2018, when Towne sent several emails to Daniels through "Success Factors," HYG's performance review software.

194.     Prior to January 29, 2018, Daniels was unsure whether HYG would offer him a position comparable in title, responsibility, and benefits to the position he held as NAM on the Amazon account, when he engaged in protected activity.

195.     Following his whistleblowing activities, Smith created this position ("customer experience manager") specially for Daniels.

196.     Upon information and belief, HYG employed no other "customer experience manager" as of January 29, 2017, except for Daniels.

197.     Prior to January 2017, the position of customer experience manager did not otherwise exist within HYG.

198.     HYG's demotion of Daniels was accompanied by a corresponding reduction in his pay, including the loss of commission, reduction in stature, and loss of opportunity for professional advancement.

199.     HYG's reassignment of Daniels to a customer experience manager resulted in changes in the commission structure of Daniels's pay.

200.     The customer experience manager position resulted in vastly reduced duties, income, and commission potential.

201.     Mr. Daniels learned, as of January 29, 2018, that his then-announced demotion to CEM necessarily would be accompanied by a decrease in his commission pay.

202.     Effective on or after January 29, 2018, HYG would make commission-based payments on the Amazon account only to McNeill—and not to Daniels.

203.     Daniels sought other employment and resigned from HYG on January 30, 2018.

204.     But for HYG's decision to demote Daniels from the position of national account manager, he would not have resigned his position with HYG.

205.    The position of CEM represents a demotion in stature. The title of "national

accounts manager" is known in the industry to carry a certain significance as an executive-

and/or professional-level position. The title of "customer experience manager," by HYG's own

internal documentation, was to be an "administrative" position.

206.    The demotion to CEM reduced or eliminated Daniels's direct contact with the

Amazon team overseeing HYG contracts. This decrease in the scope of his responsibilities

impaired his relevant job experience and future earnings potential, within HYG or for some other

company.

**FIRST CAUSE OF ACTION**
**WHISTLEBLOWER ACTION UNDER SARBANES OXLEY ACT**
**(18 U.S.C. § 1514A *et seq.*)**

207.    The allegations set out in the above paragraphs are incorporated herein by

reference as if fully set out and re-alleged herein.

208.    Plaintiff reasonably believed that the Battery Fraud constituted wire and mail

fraud in violation of 18 U.S.C.A. §§ 1341, 1343, and/or honest service fraud under 18 U.S.C.A. §

1346, including to the extent that H2O Pro kicked back proceeds to Tolley, individually.

209.    Plaintiff's reporting of the Battery Fraud to Furman and others within HYG was a

protected activity under Sarbanes-Oxley.

210.    Plaintiff engaged in protected activity by providing information, causing

information to be provided, and/or otherwise assisting in an investigation regarding conduct

which Plaintiff reasonably believed constituted a violation of one or more of the provisions of

Federal law referenced in 18 U.S.C. § 1514A(a)(1).

211.     Plaintiff provided the information to a person with supervisory authority over Plaintiff and/or to a person working for Defendant who had the authority to investigate, discover, or terminate misconduct.

212.     Defendant discharged, demoted, suspended, threatened, harassed, and/or discriminated against Plaintiff, in the terms and conditions of his employment, because of lawful acts done by Plaintiff to provide information, cause information to be provided, or otherwise assist in an investigation, regarding conduct which Plaintiff reasonably believed constituted a violation of applicable Federal law.

213.     As a direct and proximate cause of Defendant's unlawful discrimination, Plaintiff has suffered damages and is entitled to full back pay, with interest, special damages, and his reasonable attorney's fees, litigation costs, and expert witness fees.

**SECOND CAUSE OF ACTION**
**FAILURE TO PAY WAGES WHEN DUE**
**(N.C. GEN. STAT. § 95-25.6)**

214.     The allegations set out in the above paragraphs are incorporated herein by reference as if fully set out and re-alleged herein.

215.     HYG promised Daniels certain commission-based wages as a NAM, as detailed in a written Marketing Incentive Plan ("MIP").

216.     For calendar year 2016, HYG promised Daniels commission-based wages, equal to the sum of (a) a per-unit incentive, in a fixed amount determined based on the type of vehicle sold and whether the customer account was "conquest" or "non-conquest," plus (b) an additional incentive payment equal to 1% of HYG's gross margin for qualifying sales.

217.     HYG promised to pay Daniels commission-based wages earned during the fourth quarter of 2016, no later than March 15, 2017.

218.     Daniels was entitled to commission-based wages for the fourth quarter of 2016 equal to $24,664.69, that is per-unit commission of $22,275 plus gross margin commission of $2,389.69.

219.     HYG paid Daniels only $5,249.83 in commission-based wages for the same period, resulting in unpaid commission-based wages due and payable to Daniels in the amount of $19,414.86.

220.     In contravention of its own written policy, HYG offset wages owed to Daniels by subtracting certain sales that HYG elected to make on a negative margin.

221.     HYG attempted to change the promise of wages made to Daniels by modifying the calculation of commission-based pay in its 2017 MIP plan and applying it retroactively to Daniels's work in the fourth quarter of 2016.

222.     HYG's policy was to cash out unused paid time off ("PTO") upon termination.

223.     As of the date of his separation, Daniels had accrued forty (40) hours of unused PTO in 2017 and 9.8 hours in 2018.

224.     At his regular rate of pay, the amount owed for unused PTO equals $2,888.40.

225.     HYG never compensated Daniels the amount owed for unused PTO.

226.     As a publicly traded company, HYG knew or showed reckless disregard as to whether their conduct was prohibited by the North Carolina Wage and Hour Act ("NCWHA") and its accompanying regulations.

227.     Defendant did not pay all wages due when those wages were due to Plaintiff for compensable work time that the Defendant allowed, suffered, and/or required Plaintiff to work for Defendant.

228.     Plaintiff is entitled to damages in the amount of the unpaid wage, plus liquidated damages in the same amount and costs/attorney's fees.

**THIRD CAUSE OF ACTION**
**UNLAWFUL DEDUCTIONS**
**(N.C. GEN. STAT. § 95-25.8)**

229.     The allegations set out in the above paragraphs are incorporated herein by reference as if fully set out and re-alleged herein.

230.     At the time of separation, HYG promised Daniels, in writing, wages for two (2) weeks of work in lieu of notice, in conformity with HYG's policy.

231.     Daniels was owed unpaid wages for these two (2) weeks in an amount equal to $4,640.00.

232.     HYG withheld certain wage payments to Daniels, purportedly to satisfy a balance on a company credit card.

233.     Daniels never approved, in writing, the specific amount of these deductions.

234.     Defendant took deductions from the wages that were due Plaintiff when Defendant failed to obtain the written authorization required by N.C. GEN. STAT. § 95-25.8(a).

235.     These unauthorized deductions are statutory violations of the NCWHA.

236.     Plaintiff is entitled to damages in the amount of the unlawful deductions, plus liquidated damages in the same amount and costs/attorney's fees.

**FOURTH CAUSE OF ACTION**
**BREACH OF CONTRACT/COVENANT OF GOOD FAITH AND FAIR DEALING**

237.     The allegations set out in the above paragraphs are incorporated herein by reference as if fully set out and re-alleged herein.

238.     On or around March 15, 2018, Daniels entered into an agreement with HYG (the "Inspection Contract") for the company's search and inspection of Daniels's personal computing

devices, including his personal MacBook Air laptop, two external hard drives, and a zip drive (the "Daniels Computers").

239.    The Inspection Contract is a binding and enforceable contract between HYG and Daniels.

240.    The Inspection Contract includes an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.

241.    Daniels performed fully under the Inspection Contract, including by delivering the Daniels Computers to HYG and/or its agent.

242.    HYG and/or its agent ("Forensic Neutral") fully completed the inspection of the Daniels Computers in around late March 2018.

243.    Pursuant to the terms of the Inspection Contract, the Daniels Computers were to be returned to Daniels following the completion of the inspection, subject only to agreement by the parties as to the removal of HYG's data, if any, on the Daniels Computers.

244.    HYG breached the Inspection Contract by refusing to return the Daniels Computers to Daniels, or otherwise act in good faith to come to an agreement pursuant to Section 10 of the Inspection Contract, notwithstanding his repeated demands.

245.    HYG has unfairly prevented Daniels from receiving the benefits to which he is entitled under the Inspection Contract, i.e., the return of the Daniels Computers.

246.    Daniels has suffered damages from HYG's breach, including the loss of use of the Daniels Computers.

247.    The Daniels Computers contain sentimental personal data to Mr. Daniels, including family photos that are not saved elsewhere.

248.     Daniels will suffer irreparable harm by HYG's continued breach of the Inspection Contract, including the risk of loss of irreplaceable family photos.

## **FIFTH CAUSE OF ACTION: CONVERSION**

249.     The allegations set out in the above paragraphs are incorporated herein by reference as if fully set out and re-alleged herein.

250.     HYG and/or its agent came into possession of the Daniels Computers.

251.     Until the time that HYG came into possession of the Daniels Computers, Daniels was the lawful owner of the same and entitled to their immediate possession.

252.     Daniels has repeatedly requested the return of the Daniels Computers, and HYG has outright refused and/or constructively refused Daniels's demands.

253.     HYG wrongfully converted the Daniels Computers to its own use.

WHEREFORE Plaintiff Donald Daniels respectfully requests that this Court:

1.      declare that Plaintiff has suffered acts of discrimination at the hands of Defendant based on his protected conduct under Title VIII of Sarbanes Oxley;

2.      pursuant to the First Cause of Action, award Plaintiff compensation for loss of salary and other benefits, including all fringe benefits to which he would have been entitled had he not been demoted, and special damages, in an amount to be determined at trial;

3.      pursuant to the Second and Third Causes of Action, award Plaintiff damages of $26,943 in unpaid wages and/or unlawful deductions, and an equal amount in liquidated damages under N.C. GEN. STAT. § 95-25.22;

4.      pursuant to the Fourth and Fifth Causes of Action, grant Plaintiff injunctive relief in the form of specific performance for the immediate return of the Daniels Computers, and money damages for the loss of use of the same;

5.      grant Plaintiff his reasonable costs and attorney's fees, including pursuant to 18 U.S.C. § 1514A(c)(2)(C) and N.C. GEN. STAT. § 95-25.22;

6.      grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law;

7.      grant Plaintiff a trial by jury on all issues so triable; and

8.      grant such other and further relief as to the Court seems just and proper.

This the 1st day of April, 2019.

/s/ Eric Spengler
Eric Spengler (NC Bar No. 47165)
SPENGLER & AGANS, PLLC
352 N. Caswell Rd.
Charlotte, NC 28204
eric@spengleraganslaw.com
Phone: (704)910-5469
Fax: (704) 730-7861

Andrew L. Fitzgerald
N.C. Bar 31522
FITZGERALD LITIGATION
119 Brookstown Ave., Ste. 402
Winston-Salem, NC 27101
andy@fitzgeraldlitigation.com
(336)793-4365 (phone)
(336)793-4696 (fax)

*Attorneys for Plaintiff*